**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

NOV 15 2016

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| SUNDAY'S CHILD, LLC; et al., | No. 14-15374 |
| Plaintiffs-Appellants, | D.C. No. 1:13-cv-00502-DKW-RLP |
| v. | |
| IRONGATE AZREP BW LLC; et al., | MEMORANDUM* |
| Defendants-Appellees. | |

Appeal from the United States District Court
for the District of Hawaii
Derrick Kahala Watson, District Judge, Presiding

Argued and Submitted October 20, 2016
Honolulu, Hawaii

Before: WALLACE, FARRIS, and WATFORD, Circuit Judges.

Plaintiffs Sunday's Child, LLC, et al.,[1] appeal the district court's dismissal

without leave to amend. Sunday's Child sued Defendant Irongate AZREP BW

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[1] Plaintiffs are four LLCs each sharing the same sole member and will be collectively referred to hereinafter as "Sunday's Child."

LLC ("Irongate") after Sunday's Child purchased four condominium units in the Trump International Hotel & Tower Waikiki Beach Walk condominium project (the "Project"). Sunday's Child raised Hawaii state-law claims of breach of contract, conversion, tortious beach of contract, unjust enrichment, and breach of the implied covenant of good faith and fair dealing, and requested the return of all deposits paid in excess of Irongate's actual damages in connection with the condominium purchases.[2]

We review de novo whether a dismissal without leave to amend rests on an inaccurate view of the law and is therefore an abuse of discretion. *See Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1100 (9th Cir. 2004). We review the district court's interpretation and meaning of contract provisions de novo. *Conrad v. Ace Prop. & Cas. Ins. Co.*, 532 F.3d 1000, 1004 (9th Cir. 2008). We apply the substantive law of Hawaii to this case. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). We reverse.

A brief recitation of the facts is necessary to our analysis. In November 2006, Sunday's Child executed separate Sales Contracts to purchase four Project units, paying twenty percent of the purchase price as a deposit to Irongate for a

---

[2] Sunday's Child also brought a claim for punitive damages, but concedes that it cannot maintain a standalone claim for punitive damages under Hawaii law. Accordingly, we will not address this claim.

total of $1,439,320.00. Section D.37 of the Sales Contracts entitled Irongate to declare Sunday's Child in default or breach if it failed to perform any of its obligations under the Contracts and to seek specific performance or terminate the Contracts and retain the greater of fifteen percent of the purchase price or the amount of actual damages suffered on account of the breach.

In July 2009, a series of disputes arose between Irongate and many prospective purchasers, including Sunday's Child. Several prospective purchasers filed two lawsuits (the "Buyers' Suits") against Irongate, alleging various statutory and common law claims. Sunday's Child was not a party to the Buyers' Suits, although by agreement of counsel preserved its rights to participate in and/or pursue claims made or asserted in the Buyers' Suits. The purchasers in the Buyers' Suits sought to nullify and rescind their Sales Contracts and obtain return of their deposits.

In response, Irongate filed a separate lawsuit (the "Seller's Suit") against some of the prospective purchasers, claiming breach of contract and tortious interference with contractual relations and seeking specific performance of the Sales Contracts, but not rescission or termination. Sunday's Child was not named in the Seller's Suit. Instead, Sunday's Child and Irongate resolved their differences regarding the Project via a Settlement Agreement executed in 2011.

Under the Agreement, Sunday's Child was to pay Irongate "additional non-refundable payment[s]" in order to secure an extended closing for the units. If Sunday's Child was unable to timely close on the units, it would forfeit these additional non-refundable payments and "release all rights and claims pursuant to section 8." Sunday's Child was unable to make all of the scheduled additional non-refundable payments and was unable to timely close on the units. Irongate declared Sunday's Child in default under Section D.37 of the Sales Contracts and refused to return any of Sunday's Child's $1,439,320.00 in deposits, relying on Section 8 of the Settlement Agreement. Resolution of this appeal turns on the proper interpretation of Section 8 of the Settlement Agreement and its effect on Section D.37 of the Sales Contracts.

Section 8 of the Settlement Agreement reads, in relevant part (emphases added):

> [Sunday's Child] hereby releases [Irongate] from the claims made or asserted, or that could have been made or asserted, in the Litigation . . . ; provided, however, that this release does not include or release claims [against Irongate that Sunday's Child] may have **arising (a) after the execution of this Agreement**, (b) out of any design or construction defect claims, known or unknown, and (c) out of the contractual duties, rights, or obligations of [Irongate], if any, relating in any way to [operation of the hotel, the Home Owners Association, and the Trump license]. In other words, upon the execution of this Agreement, this release is intended to forever release and waive any and all claims by [Sunday's Child] **arising out of the purchase and sale of the Units and**

4

**the Litigation**, but is not intended to release, limit, or impair in any respect [Sunday's Child]'s claims as owner of the Units existing after the execution of this Agreement, subject to and limited only by the release described in this paragraph.

The district court interpreted the phrase "all claims . . . arising out of the purchase and sale of the Units" as unambiguously releasing Irongate from any claims relating to the purchase deposits. We disagree with the district court's conclusion that the Settlement Agreement is unambiguous. For instance, the district court's interpretation ignores Section 8(a) of the Settlement Agreement preserving claims arising "after the execution of [the Settlement] Agreement." Here, Sunday's Child's claims arose after the signing of the Settlement Agreement: Sunday's Child failed to make its required payments under the Agreement after it was signed, Irongate decided to declare Sunday's Child in default before the purchase and sale were complete, and Irongate then refused to return any portion of the deposits.

Settlement agreements are "a species of contract" and are governed by the principles of contract law. *Wong v. Cayetano*, 143 P.3d 1, 20 (Haw. 2006). An unambiguous contract leaves "no room for interpretation." *Id.* When a contract is ambiguous, the intent of the parties is a question for the trier of fact. *Found. Int'l v. E.T. Ige Const.*, 78 P.3d 23, 33 (Haw. 2003). We are mindful that "[i]n the

5

interpretation of a promise or agreement or a term thereof, . . . an interpretation which gives a reasonable, lawful, and effective meaning **to all terms** is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." *Kutkowski v. Princeville Prince Golf Course, LLC*, 300 P.3d 1009, 1017 (Haw. 2013) (emphasis added).

Here, all terms of Section 8 of the Settlement Agreement must be given effect. The phrase upon which the district court based its interpretation declares the Agreement "is intended to forever release and waive any and all claims by [Sunday's Child] arising out of the purchase and sale of the Units **and** the Litigation." The use of the conjunctive here makes it possible to interpret this phrase in its entirety as releasing claims relating to the purchase and sale which were set forth, or which could have been set forth, **in the Litigation**. The claims at issue here, although they relate in a general sense to the purchase and sale of the condominium units, post-date the Litigation and the signing of the Settlement Agreement. Per Section 8(a), Sunday's Child may not have released its right to seek a partial refund of deposits—or to raise related claims—based on events arising "after the execution of [the Settlement] Agreement."

Irongate also argues that Section 4 of the 2011 Settlement Agreement modified the 2006 Sales Contracts, such that Irongate was allowed to keep all

deposit monies.  Section D.37 of the 2006 Sales Contracts (the section under which

Sunday's Child alleges the breach) reads as follows:

> NOTWITHSTANDING THE FOREGOING, IF PURCHASER LOSES ITS
> RIGHTS AND INTEREST IN THE UNIT AS A RESULT OF
> PURCHASER'S BREACH OR DEFAULT UNDER THIS SALES
> CONTRACT AFTER FIFTEEN PERCENT (15%) OF THE PURCHASE
> PRICE HAS BEEN PAID BY PURCHASER, (EXCLUSIVE OF ANY
> INTEREST ACCRUED THEREON), SELLER SHALL REFUND TO
> PURCHASER ANY AMOUNT THAT REMAINS AFTER
> SUBTRACTING (A) FIFTEEN PERCENT (15%) OF THE PURCHASE
> PRICE OF THE UNIT (EXCLUSIVE OF ANY INTEREST EARNED
> THEREON), OR THE AMOUNT OF DAMAGES INCURRED BY
> SELLER AS A RESULT OF SUCH BREACH, WHICHEVER IS
> GREATER, FROM (B) THE AMOUNT PAID BY PURCHASER WITH
> RESPECT TO THE PURCHASE PRICE OF THE UNIT, EXCLUDING
> ANY INTEREST EARNED THEREON.

Irongate argues that Section 4 of the Settlement Agreement modified this

provision, no longer requiring it to refund deposit monies remaining after

subtracting 15% of the purchase price.  Section 4 states as follows (emphasis

added):

> 4. <u>Extended Closing Date.</u>  Purchaser 2005 agrees to deposit into escrow an
> additional non-refundable payment of [$98,790.00] for Unit No. 2005,
> Purchaser 2205 agrees to deposit into escrow an additional non-refundable
> payment of [$101,790.00] for Unit No. 2205, Purchaser 2217 agrees to
> deposit into escrow an additional non-refundable payment of [$107,590.00]
> for Unit No. 2217, and Purchaser 3607 agrees to deposit into escrow an
> additional non-refundable payment of [$258,500.00] for Substitute Unit No.
> 3208 upon execution of this Agreement, and all Purchasers shall make best
> efforts to close with cash no later than June 27, 2011, as scheduled by Seller
> in accordance with the terms of the Sales Contracts and this Agreement.

> Such additional non-refundable payments shall be applied to the Total Purchase Price at Closing of each respective unit. Should Purchaser 2005, Purchaser 2205, Purchaser 2217 or Purchaser 3607 fail to close by June 27, 2011, such Purchaser has the right to one additional thirty (30) day-extension to close, July 27, 2011; provided, however, that such Purchaser agrees to pay a fee of $1,000.00 ("Extension Fee") for each day of delay after June 27, 2011. Such Extension Fee will not be applied to the Total Purchase Price at Closing of each respective unit. **Should all Purchasers fail to close by June 27, 2011 or no later than thirty (30) days thereafter subject to the Extension Fee, all Purchasers will forfeit to Seller all additional non-refundable payments made pursuant to this section 4 and, furthermore, release all rights and claims pursuant to section 8.**

Irongate asserts that "this provision was clearly intended to modify Section D(37) of the Sales Contracts with respect to the return of deposits."

Nobody disputes that Sunday's Child failed to close by June 27, 2011. Furthermore, nobody disputes that Sunday's Child "forfeit[ed] to Seller all additional non-refundable payments made pursuant to this section 4." The issue is whether the original deposits, made in 2006, count as "additional non-refundable payments," such that Sunday's Child forfeited them. Essentially, Irongate argues that the bolded language above changed Section D.37 of the Sales Contracts, allowing Irongate to keep all deposits ever made by Sunday's Child.

A plain reading of Section 4 shows that the language is at least ambiguous as to this point. Section 4 required Sunday's Child to make new payments, which would be forfeited if Sunday's Child did not close on the property by the agreed

8

upon date. Section 4, however, said nothing about the original deposit made in 2006 pursuant to Section D.37 of the Sales Contracts.

Furthermore, Section 4 only requires forfeiture of "additional" payments. By this plain language, the payments that are forfeited must be in addition to some other payment (that is not forfeited). Under this interpretation, the payments that are forfeited could be the additional payments (made pursuant to the Settlement Agreement), but might not include the original deposit (made in 2006). Moreover, under this section of the Agreement, the only payments that would be forfeited were payments made "pursuant to this section 4." The original deposit (in contrast to the $50,000 Sunday's Child paid after signing the Agreement) was not made pursuant to Section 4. The original deposit was made in 2006, five years before Section 4 came into existence.

Accordingly, we conclude that the contract is ambiguous and we REVERSE and REMAND for further proceedings.